All rise. The Illinois Feller Corp Fish Division is now in session. The Honorable Justice Raina W. Mitchell is residing. Good morning, folks. Please be seated. Our first case, I'll read the dates for this one. 1-24-1341, L.A. C. Gray, M.D. That's all. First, 401 Properties Limited Partnership. Okay. Good morning, folks. We have a lot of 20 minutes assigned, with an additional 5 minutes of rebuttal for the appellant. We've reviewed the briefs and the record in the case, so you can truly take that into account in your presentations this morning. With that, we'll begin. Good morning, and may it please the Court. My name is Alan DeLinco. I am counsel for 330 South Wells, LLC. I'm here with my colleague Robert Margolis of the firm of Robinson Curley, P.C. I'm also joined by Gregory Jordan, who represents Accel at Quistians, and Lou Bernstein, who represents the 401 Properties Limited Partnership and 401 Properties Incorporated. All parties who submitted briefs on the issue of the merger doctrine cited the same statement from the same case as the essence of the law on the merger doctrine. In fact, Rock Solid cites this on page 32 of its brief. The merger doctrine provides that when one person who is bound to pay an obligation also becomes entitled to receive that same obligation, there is an extinguishment of rights. We all cited the estate of Ozier case for that proposition. Access Realty further goes on to say, once the debtor and creditor become the same person, there can be no right to be executed. So the merger doctrine, by the statement from the cases I just mentioned, applies to one person. But what's the rationale for that? I understand that that's what the language is, but what's the reason? Well, I think the... Because you're saying it's multiple parties, which it clearly is. A combination of creditors that become a combination of debtors. I would suggest it's a workability problem. If we're going to expand the doctrine beyond one person or one entity, and we start getting into situations where we have multiple persons, those persons have divergence of interests. And as we mentioned in our brief, there's kind of a slippery slope here. Is 2 the limit? Is 5 the limit? Is 20 the limit? Are we going to start looking at situations where there are 100 potential creditors and 100 potential debtors, and we have to determine whether or not there is an identity of debtor and creditor amongst all those people? But whereas here the merger doctrine is being applied to protect somebody, which is what the trial court at least thought it was doing, is it fair to say it's not available just because the debt is held by more than one person? Well, I think in this case specifically, I would say yes. The doctrine should not be available when there is more than one person or more than one entity. And that's the basis is the debtor and the creditor are to be the same. But counsel, the trial court made clear, and thankfully so, that these multiple entities were pretty much controlled or owned by the same individuals. I don't think they referred to it as the green-black cabal. Well, that was how Rock Solid referred to it. I don't think the trial court used the word cabal in the trial court's opinion. But yes, the trial court used an ownership construct. The problem with the ownership construct is that doesn't result in a proper application of the merger doctrine, which looks at liability. Who is the debtor and who is the creditor? Ownership is really irrelevant to that analysis because just because somebody owns something doesn't mean they're liable. And in this case, in the context of a limited partnership, for example, only the general partner has liability for the limited partnership debts. Limited partners do not. So looking, for example, at the ownership of 401 Properties Limited Partnership leads to an incorrect conclusion by the trial court regarding who is responsible for the debt of 401 Properties Limited Partnership. At the time of the trial court's analysis, which was in the year 2015, which is when 330 Southwells and Excel both acquired their interests, the limited partnership was controlled by Michael Harrell and his entity, 401 LaSalle General Partner. But they obtained their interest after the initial foreclosure proceedings began. That is true. That is true. They both acquired their interests, bought the paper, if you will, during the pendency of the foreclosure. But it's an established fact, and I don't even think the trial court made a mistake there. I think the trial court acknowledged that Mr. Harrell and his entity were in control of the limited partnership at that time. Where the trial court, however, was finding that by cutting through all of the entities, that Mr. Greenblatt, Chihelka, and Nichols were liable as debtors on the 401 Properties Limited Partnership obligations. They were not. They had no responsibility to pay those obligations, either the Fortuna note or the Bridgeview Bank Group notes, in 2015. I would also say, in the context of this case, because we are dealing with a limited partnership, Section 112 of the Illinois Uniform Limited Partnership Act provides that a partner may lend money to and transact other business with the limited partnership and has the same rights and obligations with respect to the loan or other transaction as a person that is not a partner. The trial court did not take Section 112 into consideration in rendering its opinion, and we believe that that section permits a partner, whether general or limited, to make a loan to a partnership and not have the merger doctrine apply to effectively wipe out that loan. And if a partner can make a loan directly to a limited partnership and not have that happen, certainly someone can acquire a loan interest and not have that happen. So even if we wanted to go through and disregard all of the entities that the trial court disregarded to get to its construct of what it called the real parties in interest construct, which was kind of based on its assessment of ownership, that did not lead to a direct analysis regarding who is the debtor and who is the creditor here. And it also failed to take into account that in the context of a limited partnership, it is expressly permissible for partners to engage in transactions with the partnership, to hold loans that are due from the partnership, to make loans to the partnership, and not have those loans affected by being, by virtue of being a partner general or limited. So we think for those two reasons alone, the merger doctrine being improperly applied from the standpoint of who is the debtor and who is the creditor, as well as the statutory section that permits the transaction to take place here. I do want to leave a little bit of time for Mr. Jordan to address you from Excel's perspective, but I also wanted to make a few additional important points. First of all, there are three faulty pillars here upon which Rock Solid rests its claim. One of those faulty pillars is that when 330 acquired its interests in the Fortuna Note, it was discharging an obligation that originally belonged to Scatter Corporation. And so as a matter of fairness, the debt should be wiped out. In fact, Scatter Corporation was discharged from all liability for the Fortuna Note as part of the settlement that occurred in 2009, by which the Fortuna Note came into existence. So there was no obligation owed by Scatter Corporation, or that could be extinguished because in fairness, the 330 Note represented an obligation of Scatter Corporation. It's just not a correct assertion. So, counsel, you mentioned fairness, and so it begs the question, this is a big picture question, and that is, do you think it's fair that these same three parties can utilize business organization to sort of do a who's on first with respect to, you know, these foreclosure proceedings? Because essentially, they're creating these new organizations, but it's really all the same three people who have interest in these various organizations. How is that fair? A couple of responses to that, Justice. First of all, it's not just the three of them. There were other limited partners and other people involved, both on the debtor and creditor side of the equation here. There were, on the limited partner side, which, again, limited partners actually aren't responsible for the limited partnership debt, but L.R. Office Properties LP was a limited partner. It had no connection whatsoever to either Mr. Greenblatt, Jehelka, or Nichols. There are family members, grown adult family members of these three individuals who had interests in a trust that was a shareholder in Scatter Corporation. Mr. Nichols' family members had interests in family limited partnerships. So it wasn't just these three individuals to begin with. Second of all, from a fairness perspective, the law in Illinois is very clear. We are allowed to establish business organizations in order to provide the limited liability that goes along with those business organizations. And the law is very clear that if we're going to disregard them, we need to do so with the appropriate evidence. And in this case, by looking at ownership, the trial court effectively pierced the veils of up to nine different business organizations and entities. The third thing I would say about fairness is, from a fairness perspective, let's look at what Rock Solid acquired to begin with. Rock Solid acquired a fractional interest in a junior mortgage when it bargained for and obtained its interests from Fortuna Stream. It was clearly a junior mortgage. It was no surprise. It knew what it was getting. It was behind a first that had been established through a bank, the Bridgeview Bank Group, and it bought its junior partial S&E position eyes wide open. What's happened here now, from a fairness perspective, is almost $12 million of liens have been wiped out. And they were legitimate liens. The trial court made findings that Excel paid almost $10 million to buy the first position. 330 paid almost $2 million to buy its position. And the trial court effectively just wiped them out and let Rock Solid leapfrog from what was a partial interest in a junior position to first position in the pecking order. That has elements of unfairness associated with it, especially when the purchases of these notes were made with tens of millions of real dollars. There's no argument here. These weren't jimmed-up, fictitious loans or fictitious liens. They were real, established liens. This was a commercial paper transaction. There is a lot of activity in the commercial sector in the buying and selling of commercial paper. And yet, at the end of the day, third became first. I'd like to, at this point, yield and let Mr. Jordan address you on behalf of the first lien holder, Excel Acquisitions. May it please the Court. I'm Gregory Jordan. I'm here on Excel Acquisitions. Excel is here to appeal from a final judgment of foreclosure and from the order that allowed for a merger of its debt into the loan. And in our view, it was an incorrect decision. And I think that in order to review Justice Johnson's question, why is it that Illinois Investment Trusts, Leslie Jubine, LR Properties, interests are disregarded? Dr. Jubine, maybe Mr. Greenblatt thinks that he is the greatest guy in the world and should do whatever he says. But you're a doctor, right? And you are eliminating, what you're doing is, if you affirm, you're eliminating their interests. This case is about them. What happened here is that rock solid is a partial S&A of a no, which gives it no rights under the law. I'm judging. Clery even made that clear in its April 2018 decision. So what it did was, but it said, you know what, we're going to let you go forward and prosecute. Why? Because at the time, there could be an argument that 330 wasn't going to present whatever arguments. We had a trial. We had so many days of trial. Rock solid stood up and put on witness after witness after witness. And then, at the end of the day, there was a decision that said that 330 interfered. You cannot look at that transcript and see where 330 interfered in any way. If 330 had said, we're going to make the exact same arguments, there is a term that's bandied about commonly. It's called money-money quarterbacking. And if 330 wasn't successful, there would have been money-money quarterbacking. Rock solid would have said, they should have done X, Y, or Z, and they would have lost. But there can't be any money-money quarterbacking because rock solid prosecuted the claim. Even though it had no right to do it as a partial S&A. And the court created a constructive trust. What is a constructive trust? A constructive trust is an equitable tool to prevent unjust enrichment tied to wrongful conduct. We've got three elements that you're far more knowledgeable than I am, I'm sure. They receive unjust benefit. That's one. I don't agree. And the third one is retention violates fundamental principles of equity, good faith, and good conscience. I don't think that we can show that. But most importantly, what we can't show in order to have a constructive trust, in order to have merger, in order to have any of this, is the second element. The second element is retention of benefit was to the other party's detriment. Let's look where they were. Bridge Free Bank enters into a loan agreement with 401 Properties Lending Partnership 2009, I think it was, 2007. Fortuna gets a junior note. White and degrees to release scattered, so that whole argument is just nonsense. And then it signs an inter-creditor agreement saying, we're in second place. We couldn't be clearer. We are behind Bridgeview. And then fast forward, effectively the same thing that they argue that Excel and 330 did, they did, because they make a big deal about this 2010 restructuring agreement, which in effect was, at least from their telling, they controlled the note. They had Harrell buy the note. Harrell, there was no doubt, he admits it, it's in the record, he was their agent. Somehow there's no merger there that wipes out Fortuna's debt. Then we go fast forward. Harrell is taking over, to your question, 2015 foreclosure. Harrell is in charge. The story is that Fortuna said, we're not going to try to collect this note. We're going to give you time to market and sell it, dress up the property, market and sell it. And then they filed a foreclosure against Harrell. Harrell files a bankruptcy to avoid a receiver. And then he goes into bankruptcy court. Then what happens? Fortuna says, we don't need this. We're in second place. Bridgeview Bank filed a $15.3 million pro for claim. We are so far out of the money, we can't even see the money. And then they say, we're going to sell our note. Rock solid, as they note in their papers, bid. $330,000 overbid. If Fortuna wanted to control that note, they had every opportunity. They can't say, oh my God, $330,000 did something wrong by buying this note. Was rock solid doing something wrong by buying the note? Fast forward. And by the way, at that time, Harrell controls the bankruptcy, controls the partnership. Bridgeview Bank controls the debt. $330,000 is the holder of a second position. Then Excel goes. They make no secret of the fact that they want to buy the Bridgeview note. And we know that because it's in evidence that there are e-mails of Larry Benjamin, who is the esteemed counsel for Rock Solid. And they say, we'll help you get financing. And Excel finds its own financing. So they knew that Excel was going forward. They bought the note. Then they said, oh my goodness, you had a UCC sale to eliminate the LaSalle General Partner loan. UCC, Article 9, 610, you give notice to parties who have a secured interest in the loan, you give notice to the borrower, and you give constructive notice to the world. They got their constructive notice. Now, here is where the Monday morning quarterbacking comes in. Fortuna says, Excel owns a note, which we wanted to assist you in buying, which we could have bought. And now all of a sudden they say, oh my God, this is horrible and terrible. We're in second place. We shouldn't be in second place. Even though we extended credit with full knowledge that we were in second place. They go into bankruptcy. And then they create this idea that Excel did something wrong. 401 submits a plan that gives Rock Solid, who is so far out of the money, something. But the court says the case is dismissed. Why? Because it was filed by Michael Horrell as a lack of good faith. It wasn't dismissed because of anything Excel did. It was because of the original filing was a lack of good faith. So then we go into the situation where the Limited Partnership Act comes in, where we have the limited partners can loan money, can do business unfettered. Even the general partner lacks fiduciary duties to the partnership. But whatever happened, we go back to the fact that this is not about Greenblatt and Nichols and Jahelka. This is also Illinois Investment Trust and the RLJF Trust and L.L. and Leslie Dubin. In order to find a merger, in order to find a constructive trust, you have to eliminate not these people's interests. You have to contract a way that the law would require that innocent third parties lose their interests in order to find merger and in order to find a rock solid, which was in second place when it started and is in second place when it's finished. Counsel, can you address the trial court's finding that Southwells did little to enforce its rights under the note? Because I think that is the basis for the trial court's finding that a First off, it did file a foreclosure action, but it didn't have to. As long as it filed an answer and indicated its lien position, then its lien position was protected. But getting back to my point before. But it didn't have to because of the conflict of interest, correct? I don't know whether there's a conflict of interest, but as I said, if 330 had done any more, rock solid wouldn't have done any less. Is there anything in the record that indicates that rock solid was impeded? Whether 330 stood up, it filed that foreclosure action, it sought to foreclose a second lien. If it didn't share the same view of the world, you know, and I don't view the facts and the law as a supporting position, as a martial position, which clearly I don't, and if I put a 330 hat on, I wouldn't either. I wouldn't have a good faith basis to make that argument. But rock solid believed in that. It was impeded in no way. The idea that it did not prosecute is, frankly, a red herring because it implies that there was something missing. And there was nothing missing because rock solid put on days and days and days of evidence and filed a, you know, put on witness after witness after witness and cross-examined, cross-examined, cross-examined. There was no impediment. What the court was saying was, if the court was saying that rock solid was somehow impeded by the fact that 330 wasn't more active, then there's nothing in the record that supports that view. And if rock solid wasn't impeded, then whatever 330 did is of no moment because rock solid had more time at the podium and more time in the witness stand than anybody else in the case combined. So there was no imposition on rock solid. If 330 had filed an appeal and tried to get them out, you know, or something, and then said, all right, we're going to do this, rock solid maybe would have that argument. But rock solid was not impeded in the slightest bit by 330 filing an answer, filing a complaint to foreclose, getting out of the way, and allowing rock solid to proceed. So... You've gone quite a bit over time. I'm sorry. But I have one last question. If you can just, and this may be a very basic question, but Liz, just who in your mind are the innocent third parties? Who are the innocent third parties? Illinois Investment Trust. I'm sorry, say it again. Illinois Investment Trust. Okay. Leslie Jevine. Okay. R-O-L-L-J-F Limited Partnership. Okay. And L-R Properties. Okay. None of them are any of these guys. And if you're going to create a merger situation because somebody is a president, you know, or a father, or a director, then there's no bound to the merger. Thank you for your question. Also, whenever you're ready. You know, as this case is so old, I think I was practicing for all of you in the trial when it started over a decade ago. While I heard so much, I hardly recognized the case. It wasn't just the failure to enforce the note. There was so much more. And essentially, 330 frustrated the entire premise of the deal. Correll came in. He bought the first note. He was an associate of Fortuna. The deal was wait. Everybody agreed, wait. My client waited five years in accordance with the deal. They wanted it waited because they wanted to defer the tax consequence of dry income and to wait for the market to recover. After five years, we filed the foreclosure to move along the sale. That was Correll had an absolute right under the agreement to sell after five years. And so he said he filed a bankruptcy to, you know, basically to preserve his right to sell so he could orderly sell through the bankruptcy court. He filed a plan of liquidation provided for sale. He filed a motion to sell. What did they do? They used the bankruptcy. They came in and they frustrated and defeated the agreed-upon plan. And they did that in breach of their fiduciary duties as former disassociated partners. This was something that was agreed upon when they were partners. Specifically, that restructuring agreement said that Correll would come in and he would negotiate a settlement of the Fortuna note. And Correll testified that he would have. He was confident he would have made a deal with us. And he would have. And we would have gotten. My client, Roxal, would have gotten paid. Mr. Jordan, appreciate his compliment. He said that was fanciful. Well, that's what they said when they filed their objection to the motion to sell. They said they were going to file a plan that would make everyone paid in full. Because on the debtor's schedule, the property was listed as $20 million. Correll listed the first mortgage as $15 million. And we were contending that it was $10 million. That that's the amount that was owed. And, in fact, that's what they ended up paying, $10 million. And so there wouldn't have been enough equity. We would have negotiated a deal with Correll. And Roxal would have gotten paid in bankruptcy. Instead, 330, who was a co-tenant. Now, Mr. Bernstein, in his papers, he says they're not co-tenant because they don't have unity of possession. Unity of possession means it means an undivided interest. That's what unity of possession is. And I didn't have a chance to reply, but that's referred to in the case of In re Marriage Humphrey, 101 OF 3rd, 3D 1134. And you can see in the assignment to my client, it expressly says he has an undivided interest in the note and an undivided interest in the mortgage. So they were our co-tenant, 330. It wasn't just that they bought the note or the Fortuna note. It's how they, that in itself, that in itself might have been bad enough because, as we argued, they were essentially discharging a debt that Scatter, their parent, should have paid in the first instance. And when I asked Mr. Jahalka why that was fair, he said, I don't know. I can't tell you why that was fair. So in itself, yes, I think just buying it in itself would have been bad, but it's what they did with it. And I don't know what they did with it, but it wasn't just that they bought this Fortuna note. There were two different Fortuna notes on two buildings. They bought both of them. And the testimony from Mr. Greenblatt was we assigned zero value to this. They paid $2 million, and we assigned $2 million to the other note. And they got their $2 million back. So here they are, a former partner. They can't profit. They got their $2 million back. But, again, it's what they did with the note. They objected to the sale. They used the objection to delay the sale. Then they surreptitiously acquired the Excel note, and they kicked out Harrell. And that was Jahalka's word. That wasn't my quote. He said they came up with a plan to kick out Harrell. They kicked out Harrell. This is a big fib, if you will, in their brief, where they say Harrell had control until February 2017. Not so. The testimony is so clear. As soon as they bought it, they kicked him out. They filed their notice. They told the bankruptcy court. Peter Roberts testified. He said that the landscape of the case had changed. And within 90 days, they withdrew the sale motion. They got an order in March. They filed a motion in the bankruptcy court in March of 2016 to remove Harrell. In June, they got an order recognizing them as a provisional right to control the debtor. And also in March, they, 4-1-8, moved to replace the property manager, GCF, which they were successful at. And then they filed a plan. This incredible plan where everybody gets paid except Rock Solid. Not only that, the junior creditors get paid who are unsecured. They get paid 100%. And my client, who holds this interest in the mortgage, gets pennies on the dollar. And that was so unfair. And when I asked to help, why is that fair that Greenblatt, who owns Repurchase, gets 100%? Why is that fair? He said, I don't know. I'm confused. I was wearing so many hats. And that's the essence of the merchant doctrine. The confusion. Thank you. I was about to bring you back around. Please address the merger doctrine and the appellant's contention that it should not be applied when there are multiple entities. And that it should only be applied to situations where there's one entity or one person. Yes. May I take it to reverse? Let's say that there is no cause of action for merger. And what the cause of action was foreclosure. And to terminate their interest. That's the cause of action. This reason that the judge gave is a reason. But it's not the only reason. He found that it was not fair and equitable for them to assert their interest in this bankruptcy. And he heard all this testimony. For eight days and eight witnesses, he heard the bankruptcy attorney. He heard Harrell. So that's the finding. That foreclosure is an equity proceeding. Inequitable conduct is a defense. And he found that they could not enforce their interest. Now in terms of applying the merger doctrine, using that as a reason, he was absolutely correct. But as I say, there were so many other reasons. And so the way I see it on the merger doctrine, it's not you're finding that all the, you know, tracing down to all the equity interests are the same person. The same person is Excel and 401 and the debtor. That's the same person. And everywhere along the chain, they're all controlled by the same people, regardless of the ultimate different equity interest. And, by the way, the only different equity interest, everybody else is, Dr. Jubine is his wife. The testimony was she deferred to him in everything. He said it. Greenblatt said it. She deferred to me in everything. And all the rest were family estate planning entities. And they controlled it all. The only one they didn't control was that 5% interest that they gave to the broker, the debtor. And he wasn't prejudiced at all by the application of the merger doctrine. But the law allows it. The law allows them to set up these entities for that purpose, so. Absolutely. And had they not engaged in inequitable conduct, merely being a limited partner, that in itself would not be a basis to apply confusion. It's what they did. It's what they did in the bankruptcy. And, by the way, those cases where they're sudden or brief about a co-tenant, a tenant in common not taking a hostile position, that's exactly what they did. They took a hostile position, not only in the bankruptcy court, but after the bankruptcy judge thought their conduct was bad faith. And she didn't find that Harrell filed. You can read the opinion. She goes on to write that she cites all the other cases where Greenblatt was found to engage in bad behavior. She found that that was the reason. And the trustee's motion wasn't simply limited to lack of filing a technical report. He also objected to that conduct. So those statutes, and, by the way, they did not raise it below. So waiver, but even if you didn't apply waiver, all it says is by mere fact of being a limited partner, confusion doesn't apply. But that's not our contention. Our contention is that bad behavior, what they did with it, a co-tenant buying the interest, using it to squeeze out my client after agreeing, not only breached their fiduciary duties from being former general partners, breach of fiduciary duty, former general partner, breach of fiduciary duty, co-tenant, breach of the restructuring agreement, breach of the duty of good faith and fair deal under the partnership agreement. And we cite that Labovitz case where the partner basically scrolls out his other partner and he claimed, well, the agreement gives me the absolute right to make distributions. So I could basically, I think what happened in that case, he basically oppressed him by causing all this drying. Is it fair to say that what you're saying is that Merger is kind of a shorthand for all this bad behavior or a way to sort of, a way to look at all this bad behavior, but it really is not just an identity of interest here? Actually, what I could say is Judge Cleary is an excellent judge. Well, he figured it out. Judge Cleary is an excellent judge. He figured it out either way. Well, yes, granted. But all this behavior clearly informed his decision. He did not pierce the corporate veil. He saw exactly what was going on. We argued this case for years. And there are, underlying everything he did, a lot of factual findings that we have to defer to as factual findings by the trial court, correct? Absolutely, but not just his factual findings. Any evidence in the record that supports the ultimate judgment. The ultimate judgment is that it's inequitable for these people to enforce their interest to the detriment of my client. And if I could just address, it didn't come up, but I do want to mention in 401 Inks the way they put the burden of proof. They said we had the burden of proof. The burden of proof was only to show that we transacted business in Illinois. That's not accurate. It's transacted business in violation of the law, which means the burden of proof was on them to show that my client was not engaged in interstate commerce. In terms of your standing to bring this up. Absolutely. And the burden to show not engaged in interstate commerce, that was expressly stated in the case of Bank of America v. Edward R. Fudge. And they never put on any evidence of that? No, no evidence whatsoever. And if I understand your brief correctly, when they raised this in the post-trial motion and you said, let us respond, the judge said, no, I've already decided that that's done. There's no evidence of that? Well, yeah. He said, first he asked to read all the briefs that we submitted, and then we read the briefs. And then he said, and you didn't put any on evidence during the trial. It's too late. And so he said, you know, I don't need to address your motion. It's moved.  You know, when they got back to the – after the – after frustrating the bankruptcy case, which if you just look at the record, it's absolutely that's what happened. Harrell testified that as soon as they brought the interest, brokers didn't take direction from him. A week after – a week after Jehelka testified that they were withdrawing their adversary proceeding, so at the very beginning, Mr. Jordan, you know, pretended to be shoulder-to-shoulder with me enforcing 330's interest, and then he surreptitiously on behalf of his client went and bought the Excel note without affording the debtor. It essentially torpedoed the debtor's opportunity, which was, you know, to negotiate, which the – a settlement and a plan, which the debtor had an absolute right to do on fiduciary duty, as a former general partner, but also in accordance with the agreement. Five years my client waited. That was the deal. And then they come and they assert what I – and just come back to that Labovitz case, and they say, oh, well, we had the right to kick out Harrell upon discharge of the debt. The testimony was, no, being released from the debt was contemplating connection with an eventual resolution and sale. And so that's an abuse of that provision to come in and sell. Like I said, there was a bankruptcy court order in June that recognized 401E as the provisional general partner. They followed the squeeze-out plan, and then the court dismissed the case because it was bad faith. Interestingly, then, Michael Moody, in September, as soon as the bankruptcy case was dismissed, he filed an appearance on behalf of the debtor. That never changed throughout the case, even after, you know, they got their declaration from the appellate court in February that, you know, that Harrell was not the general partner. So they had control of the debtor, or they certainly frustrated and defeated Harrell's control of the debtor and the debtor's opportunity to reorganize and negotiate a settlement as soon as they bought that Excel debt. And when they came back to the bankruptcy court with the attorney for 330, he wouldn't file a counterclaim to enforce the note. Oh, and Justice Johnson, I wanted to mention, it was not just the – the trial court didn't just find it was a failure to enforce the note. It found that it was – there was a breach of duty as a matter of law. And I think those cases that we cite on page 58, you know, there's so many other appellate court cases about a co-tenant not acquiring an interest hostile to your co-tenant, a confidential relationship. There's many more cases besides the ones on the side of Nicholas v. Dobbs and Frank v. Frank. So he found there was a breach of duty as a matter of law, not just as a matter of fact, which was their dominance and their abuse of the note, refusing to enforce it. And when they came back to court, to Franco's court, I made a demand on them to file a counterclaim. What I was told was, oh, we're not filing a counterclaim unless you deposit, you know, I forget the amount, millions of dollars. Because – like, why would I have to deposit millions of dollars? Well, because – right, because you have to pay off Excel's – you have to pay off Excel. That's what they said. You have to pay off Excel in order for us to assert a note. And so in order for my client to assert a 330 cent interest, they demanded that we first pay $3 million to discharge Excel. So that wasn't fair. Does that conclude your argument, counsel? Unless the court has any questions, yes, it does. All right. Thank you. Thank you, Mr. President. Mr. DeLincoln, whenever you're ready. Thank you. The bubble's always hard. There's always a list of things you want to say. I'll try to hit the high points because I know I only have a few minutes. This was a wonderful presentation. But the confusion, if there is any confusion in this case, is coming by virtue of a torrent of irrelevancies, a backstory. There really is no confusion when you look at the entities. We've laid everything out in the brief. Who owned what entity? Who owed what obligation? And whether we like it or not, the trial court in this case pierced the corporate veils of a number of entities without going through the traditional exercise that is required under Illinois law to do that, even piercing a trust, which I'm not sure there's any authority in this state to do. So there's that. The case and the situation is not as confusing as counsel would like us to believe. And the statute, Section 112, absolutely allows the transactions that occurred here and precludes the application of the merger doctrine. Now, a lot of time was spent in Mr. Benjamin's argument focusing on this deal, this 2010 Harrell deal, which was memorialized in the Second Amended and Restated Agreement of Limited Partnership, which superseded any e-mail traffic that occurred before that. Let me be clear. Rock Solid had no rights as a result of that arrangement. It was not a third-party beneficiary. And nobody owned it any fiduciary obligations. Rock Solid was never a partner in 401 Properties Limited Partnership. Nobody owned Rock Solid anything at that time. And far from being a binding agreement that was going to solve everybody's problems, Rock Solid itself characterized that arrangement in its brief as a bet. Called it a bet. The bet was that the real estate market would reinflate, and if it did, everybody could leave happily later on if there was enough equity in the building to pay off what at that point was Rock Solid's minority position in a junior mortgage. But it was nothing more than a bet, and the bet didn't materialize. Rock Solid, despite its desire to pin all of its frustrations on the actions of the appellants, did plenty during the bankruptcy to frustrate the sale of the building. Rock Solid doesn't want to acknowledge that in the bankruptcy, it too objected to Mr. Hurrell's attempts to sell the building in the bankruptcy. This is part of the bankruptcy court record, which the court can take judicial notice of, and in its papers in that case, Rock Solid referred to Mr. Hurrell, who was in control of the Limited Partnership at the time, as the puppeteer who was pulling the strings of the debtor, as well as 401 LaSalle Lenders LLC, which was Mr. Hurrell's entity, the purported holder of a $15 million first mortgage lien against the property. Rock Solid was fighting just as hard against Hurrell's efforts in the bankruptcy as anyone and everyone else was. The trial court made a finding that there were fiduciary duties that were owed by 330 to Rock Solid, by virtue of them sharing an interest in the Fortuna note, not because of anything else. We submit to you, there's no case law in this state that would support the imposition of such fiduciary duties as a matter of law, as there is typically in an attorney-client relationship, a principal-agent relationship, merely because they shared an interest in a note. That's the source of the fiduciary duties that the trial court found, and we think those are incorrect. That that is an incorrect conclusion as a matter of law. The trial court did continue and analyzed whether or not 330 dominated Rock Solid, which was the question that you asked, Justice Johnson, about 330's conduct during the foreclosure. However, as part of the trial court's analysis of whether or not a fiduciary duty existed as a matter of fact, the problem is the trial court's analysis in that regard only related to the dominance element. And while we don't think that the conduct of 330 in the foreclosure proceeding frustrated Rock Solid in any way, I will tell you it's typical in foreclosures for junior lien holders to just appear and sit on the sidelines while the senior lien holder slugs things out, and if a judgment of foreclosure is entered and the junior lien holder's position is memorialized in the judgment of foreclosure, that's fine. So be it. But the trial court never analyzed whether or not Rock Solid placed any trust, reliance, and confidence in 330, which would be the other elements necessary for the establishment of a fiduciary relationship between 330 and Rock Solid as a matter of fact. And that's why we think the court's conclusion that such a fiduciary duty existed is incorrect. Now, if I read the trial court's ruling on its imposition of a constructive trust, not because of the conduct of 330 during the trial, but because the court was concerned that there might be a double recovery in this case, were the Excel note and the Fortuna 330 note to both be paid. The problem with the court's analysis in that regard is it's not a double recovery situation. Those were two extant separate obligations. They always existed separately. They were purchased separately. Paying the first on the BBG Excel notes and paying the second on the Fortuna 330 note would not be a double recovery in any way, shape, or form. That would be the payment of two separate obligations. That, I believe, was the reason the trial court imposed a constructive trust in the first instance, and it's just an erroneous conclusion from the facts. As far as the fight that took place in the bankruptcy court, I welcome you all to wade through it. It's a little difficult. Ultimately, the bankruptcy was dismissed by Judge Cox basically for one reason. She found that Mr. Hurrell had filed the bankruptcy in bad faith. The bankruptcy, by the way, which had been filed because Rock Sauer began the foreclosure proceeding and sought the appointment of a receiver, and Mr. Hurrell testified in the case below, he didn't want a receiver in control of the property, so he made the decision to file the bankruptcy. Mr. Greenblatt, Mr. Jahalka, Mr. Nichols had nothing to do with the decision to file the bankruptcy. They were not in control of that limited partnership from 2010 until the trial court and the circuit court of Cook County issued an order in 2017 dispossessing Mr. Hurrell and his entity from the general partnership of 401 Properties Limited Partnership. The last thing I would like to say is Rock Sauer's case is all about fairness and equity. They're just asking the trial court to make equitable findings and do equity and do fairness. And while I know, Justice Mitchell, you spent some time in the Chancery Division as a chancellor, the equitable powers of the court are not unconstrained. They're not limitless. They have constraints, and they're constrained by law. In this case, there's a statute that applies, Section 112 of the Uniform Limited Partnership Act, that precludes the trial court from exercising equitable powers that go beyond what that statute says is permissible and the trial court doesn't have the limitless power to simply make a ruling that avoids the application of a clear and unambiguous statute. At the end of the day, Rock Sauer went into this situation, it bought a small minority fractional interest in a junior mortgage. Nothing about the acquisition by Excel or 330 changed anything about that. The only thing that changed is after creating a lot of confusion with a lot of facts, the trial court believed that it didn't like what happened here, so it decided to wipe out $12 million worth of extant liens and financial obligations. We suggest to you that that was improper. The relief we seek is a reversal and a reordering, a reinstitution of the liens. Excel should go first, 330 and Rock Sauer holding parts of, not as a holder in the technical sense, but owning or holding parts of the second should be in second and second and a half place, if you want to look at it that way. But reordering things to put Rock Sauer on the top is the most inequitable outcome that could occur in this case. Thank you. Thank you, counsel. Counsel to both sides for excellent presentations and briefing. That will be taken under revising. With that, we're adjourned.